J-S34033-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE ADOPTION OF W.R.S., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M., FATHER | : : : : : : : : | No. 633 WDA 2024 |

Appeal from the Decree Entered May 2, 2024
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s):  32-20-0414

BEFORE:   DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: October 15, 2024**

L.M. ("Father") appeals from the decree entered in the Court of Common Pleas of Indiana County Orphans' Court, which involuntarily terminated his parental rights to his minor child, W.R.S. ("Child") (born in June of 2016), pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938. After a careful review, we affirm.

A panel of this Court has recently set forth the relevant facts and procedural history, in part, as follows:

> Mother and Father had a brief non-committed relationship. When Mother informed Father of her pregnancy, Father did not participate in Mother's medical appointments prior to Child's birth and was not present at the birth of Child.  He is not listed on Child's birth certificate.  Prior to Child's birth, Father was convicted

---

[*] Former Justice specially assigned to the Superior Court.

and sentenced for drug-related and domestic violence offenses, and [he] was incarcerated in June 2016.

Shortly after Child's birth, Mother began a relationship with Stepfather. They began living together in June 2017 [in Clymer, Pennsylvania, which is in Indiana County,] and they married in July 2020. Stepfather has assisted in raising Child and supporting her financially[.] [He] has been the sole paternal figure in her life.

Father had no contact with Mother until approximately one year after Child's birth when he sent a letter to Mother from prison. Father remained in prison until April 2, 2019. He had no contact with Child while he was incarcerated but spoke to Mother on the phone and wrote her approximately 15 letters over that three-year period. Father's only contacts with Child occurred following his release from prison. According to Mother, at her invitation, Father attended a birthday party for Child in July 2019 and "got her some birthday presents and cupcakes, and he just talked with [Stepfather] mostly." N.T., 7/26/21, at 15.[1] Father saw Child a second time "maybe three or four weeks later," again at Mother's invitation. *Id.* Mother's recollection of this interaction is that Father "got to see [Child] and have a conversation with her and she just kept on playing." *Id.* Father has not seen Child since those visits.

Father generally blamed Mother for his lack of contact with Child, indicating that he reached out to Mother in "March and May" of 2020 to try to see Child, but Mother blocked him on her phone and on her Facebook account. *Id.* at 41, 42, 50-51. Father contends that he did not make any other efforts to have a relationship because he was afraid Mother would pursue criminal charges if he continued to seek contact. *Id.* at 40-51.

Mother admitted that she became unwilling to permit Father to have contact with Child; she blocked Father on her Facebook account and her phone; she would not have allowed Father to have even supervised contact with Child if he requested it; and Father did not know the address where she resided for the last two years. *Id.* at 17, 21-26. Mother indicated that her last contact with Father involved an exchange of heated text messages that occurred sometime in 2020, after which she "just blocked him." *Id.* at 23.

_____

[1] As this Court noted in the prior appeal, the July 26, 2021, notes of testimony incorrectly bear the date of July 26, 2020.

In the months following the last exchange of text messages, Father learned of Mother's new address from a third party. *Id.* at 41. He then filed a complaint for custody and a complaint to establish paternity/request for genetic testing…on or about October 14, 2020. *See* Orphans' Court Opinion, 9/17/21, at unnumbered 1. One week later, on October 21, 2020, Mother and Stepfather filed a petition to involuntarily terminate Father's parental rights, as well as a petition for adoption of Child by Stepfather. After a continuance, the Orphans' Court conducted a termination hearing on April 13, 2021, and entered a decree on April 16, 2021, granting the petition to involuntarily terminate Father's parental rights to Child.

On April 20, 2021, despite the involuntary termination of Father's parental rights, the Orphans' Court conducted a hearing on Father's complaint to establish paternity/request for genetic testing. At the hearing, Father claimed that although he was aware that the original termination hearing had been continued, he did not receive notice of the rescheduled hearing date of April 13, 2021. Considering this information, the Orphans' Court vacated the April 16, 2021, decree and scheduled a new termination hearing.

On July 26, 2021, the Orphans' Court conducted a second termination hearing at which Mother, Stepfather, and Father testified.[2] The Orphans' Court denied Father's request for genetic testing because Mother did not dispute that Father was Child's biological father. On August 9, 2021, the Orphans' Court entered a decree granting Mother and Stepfather's petition to involuntarily terminate Father's parental rights to Child. [Specifically, the Orphans' Court terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(1) and (b).]

Father's counsel filed a timely notice of appeal and a concise statement of errors complained of on appeal.

*In re: Adoption of W.R.S.*, No. 1036 WDA 2021, at *1-5 (Pa.Super. filed 4/20/23) (unpublished memorandum) (footnotes omitted) (footnote added).

On appeal, Father raised two general issues:

---

[2] The Orphans' Court appointed counsel to represent Child's legal interests.

1. Whether Mother and Stepfather failed to prove by clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.A. § 2511(a)(1)?

2. Whether Mother and Stepfather failed to prove by clear and convincing evidence that the best interests of the Child would be served by terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b)?

*Id.* at 6 (quoting Father's brief at 5).

In examining Father's issues, this Court rejected Father's specific claim that his filing of a custody complaint within six months of the filing of the termination petition, without more, constituted the affirmative performance of a parental duty, which prevented Mother and Stepfather from meeting their evidentiary burden under Subsection 2511(a)(1). Rather, we held that, while the custody proceedings provided evidence that is "highly relevant" to the question of whether the requirements of Subsection 2511(a)(1) have been met, it was but one factor to be considered under a totality of the circumstances analysis. *See id.* at 12.

We then examined Father's claim that the Orphans' Court abused its discretion in concluding he evidenced a settled purpose of relinquishing his parental claim rather than finding he was precluded from engaging in his parental duties because of obstacles placed by Mother. *See id.* at 13. Father specifically contended "Mother erected barriers to his exercising his parental responsibilities because she blocked him from contacting her through her phone and Facebook account, and he was unable to ascertain her address." *Id.*

This Court acknowledged:

> The question then is whether Father has sufficiently established that there were active barriers to his exercising his parental responsibilities. Our Supreme Court…has stated that parties claiming that "barriers" prevented them from meeting their responsibilities must show that they exercised due diligence in overcoming them.

*Id.* at 15 (quoting in *In re Adoption of L.A.K.*, ___ Pa. ___, 265 A.3d 580, 592-93 (2021)).

However, we determined the Orphans' Court never addressed whether there were barriers that substantially impeded Father's exercise of parental responsibilities. Specifically, this Court held:

> Because this is an issue of fact for [the Orphans' Court] to address in the first instance, we must remand this matter to the [Orphans' Court] to determine whether there were substantial barriers preventing Father from exercising his parental responsibilities, whether those barriers were reasonable, and whether he took appropriate action, with "reasonable firmness" to overcome those barriers.

*Id.* at 16 (citation omitted). Thus, this Court vacated the decree, remanded for further proceedings, and relinquished jurisdiction.[3]

Upon remand, the Orphans' Court held a termination hearing on March 6, 2024.[4] Mother, who is a registered nurse, testified she lives with

---

[3] We specifically noted that, given our disposition, we need not address Father's second issue on appeal. *Id.* at 16 n.8.

[4] The Orphans' Court appointed counsel to represent Child's legal interests. Mother and Stepfather were represented by private counsel, and Father was represented by court-appointed counsel. Moreover, the Orphans' Court noted

*(Footnote Continued Next Page)*

- 5 -

Stepfather, Child, and her two other biological children. N.T., 3/6/24, at 9. Mother admitted that, for a brief period prior to Father's incarceration in 2016, she was involved in a lifestyle that included drugs, and Father was her drug dealer. *Id.* at 10. Mother testified she was "afraid of [Father]." *Id.* Mother testified she stopped using drugs in April of 2015, and after that, "[she] wanted nothing to do with [Father's lifestyle]." *Id.* at 10-11. Mother clarified that, to her knowledge, Father was a full-time drug dealer. *Id.* at 11.

Mother testified Child was born in June of 2016, and she wanted to protect Child "as much as [she] could." *Id.* at 12. She indicated that she "didn't want [Child] to be around drugs or anybody who sold drugs or bought drugs. I didn't want her to even know that was such a thing until, you know, it was out of my control when she was maybe an older teenager." *Id.* Mother noted that, on the same day Child was born, Father was incarcerated for drug-related charges and domestic violence. *Id.* at 13. Father was not released from prison until April of 2019, when Child was just a few months shy of turning three years old. *Id.*

Mother testified that, after Father's release from prison, Father told her that "he had found God, he was a different person, he's changing his life around, he wasn't going to live like [he used to], and he was going to get a

_____

there was a delay in holding the hearing on remand because arrangements needed to be made with the U.S. Marshals Service to permit Father's participation by video. N.T., 3/6/24, at 6.

regular job." *Id.* Although Mother was "very leery" of Father's alleged change, she wanted to give "him the benefit of the doubt." *Id.* Thus, she arranged for Father to meet Child and have a "couple [of] visits in-person" with Child during the summer of 2019. *Id.* Specifically, Mother confirmed that, at her invitation, Father visited with Child twice during July of 2019. *Id.* She indicated that, to her knowledge, these visits are the only physical contact Father has ever had with Child. *Id.* at 14.

Mother testified that, after the two visits, she had "a conversation on the phone [with Father] once or twice, and then [she] would not hear from him for weeks or months." *Id.* at 15. She noted that, during the brief telephone conversations, Father asked minimal questions about Child and, instead, harassed Mother. *Id.* During these telephone conversations, Father never specifically asked about Child's well-being, her preschool attendance, her doctor's visits, or her favorite food. *Id.* at 16-17.

Mother testified that, in addition to phone calls, she and Father exchanged text messages; however, initially, she was unaware that the text messages were from Father since he was using a new telephone number.[5] *Id.* at 17. Specifically, during a two-day period, from September 30, 2019, to October 1, 2019, Father and Mother exchanged several text messages. Initially, on September 30, 2019, at 10:15 a.m., Father texted her to "take

---

[5] Mother also entered a copy of the text messages into evidence as Petitioner's Exhibit A, which is included in the certified record.

heed" and "stop calling Zack for you know what." ***Id.*** at 18. Mother responded to this text message that same date as follows: "What? Take heed? And Zack who? Whoever you are, you need to get your stories straight before you go threatening someone….Lose my number, psycho." ***Id.*** at 18-19. Later in the day, Father identified himself in a text message by asking "How is my baby[?]" ***Id.*** at 24.

On October 1, at 5:47 p.m., Father sent Mother a text indicating he wasn't the "enemy at all." Petitioner's Exhibit A. Mother responded at 6:24 p.m. that she wanted to know who was saying "damaging things about [her]." ***Id.*** Father responded at 6:28 p.m. that Mother should stop "acting like a f***ing lil snob like u high and mighty like u better than me." ***Id.*** Mother responded at 6:34 p.m.: "Don't accuse me. And you walked out of our lives when you continued to sell drugs. I don't want anything to do with drugs. So don't message me again." N.T., 3/6/24, at 20; Petitioner's Exhibit A.

In a subsequent text message that day, Mother accused Father of still selling drugs. N.T., 3/6/24, at 22. Father texted back he "did a few times so [he could] get his f***ing license cause [he] couldn't afford them." ***Id.***; Petitioner's Exhibit A. Mother testified she interpreted Father's text message to mean that he was still selling drugs, but he was trying to provide a legitimate explanation for doing so. N.T., 3/6/24, at 22. Mother testified that, other than asking how his "baby" was on September 30, 2019, Father never inquired in any of these text messages about Child. ***Id.*** at 24.

Mother indicated that, during this two-day period, she also had a telephone conversation with Father, and she accused him of continuing to sell drugs. *Id.* at 23. Father "said that he had to because he had to save the house in Johnstown." *Id.*

Mother indicated that, at some point, she blocked Father's phone number; however, Father continued to contact Mother intermittently. *Id.* at 32. Specifically, Mother testified that it became "common" for Father to telephone or text her from different telephone numbers. *Id.* at 19. She indicated Father texted her using "at least three burner [phones] and sometimes a family member's [phone]." *Id.* However, she testified there were times after July 2019 when she would not hear from Father "for months." *Id.* at 33. She confirmed that she never changed her cell phone throughout Child's life. *Id.* at 39.

Mother testified Father contacted her via Facebook; however, she blocked him on Facebook. *Id.* at 33. She testified that, similar to the text and telephone conversations she had with Father, his Facebook messages were directed at harassing her as opposed to seeking information about Child's well-being. *Id.* Mother noted that Stepfather's Facebook was active, and his telephone number was "publicly available on his Facebook page[.]" *Id.* However, Father neither called Stepfather nor reached out to him to see how Child was doing. *Id.* at 34. Also, Mother indicated she was friends on Facebook with many of Father's relatives, and, if Father wanted to contact her

through Facebook, he could have used his relatives' Facebook accounts. *Id.* at 38.

Mother testified that, on August 31, 2020, more than a year after Father had last visited with Child, she sent a text message to Father indicating that, if he wanted to see Child at the park, she would be willing to work something out. *Id.* at 26. Father responded back, "Of course I do, sweetheart." *Id.* Mother testified that she envisioned a supervised visit between Father and Child. *Id.* However, Father did not "ever follow up to actually make arrangements to see her at the park[.]" *Id.* at 27.

Mother testified she had reservations about Father having unsupervised contact with Child because he had threatened to take Child to Ohio, which is where Father's other children reside. *Id.* at 28. Mother was afraid that, if Father took Child to Ohio, he would not bring her back to Pennsylvania. *Id.* at 29. Mother indicated Father's other children experienced a period of homelessness while in Ohio. *Id.* at 28. She testified that, in addition to seeing his other children, Father went to Ohio "to obtain his drugs." *Id.* at 30.

On September 24, 2020, Father sent Mother a text message asking, "How are you and my baby girl?" *Id.* Mother testified that, during this conversation, she told Father that Stepfather was going to adopt Child. *Id.* She noted she had told Father previously that "if [his] lifestyle was going to continue, if he was going to sell drugs and pop in and out of her life, that [she]

wanted him to just walk away and let [Stepfather] adopt her because he's the stable father in her life." *Id.* at 28.

Mother testified she, Stepfather, Child, and her other biological children moved "in 2020…in the winter…between November and January." *Id.* at 34. Specifically, their new house was approximately five blocks away from their old house in the same town. *Id.* Mother clarified that, when Father visited with Child at the park in July of 2019, she pointed to the house and informed Father it was the house to where she was planning to move. *Id.* She noted she and Stepfather still own their "old" house, and it generates rental income for them. *Id.* at 35. She testified that, if Father could not remember where the "new" house was located, he could have asked any of the tenants of the "old" house for Mother's address. *Id.*

Mother testified she discovered Father had purchased Christmas gifts for Child in 2020. *Id.* She indicated he neither mailed nor brought the gifts to Child. *Id.* Rather, a third party told her that Father was planning to give Child Christmas gifts, and Mother told the third party to tell Father, "Don't bother." *Id.* at 36. Mother testified that, at this point, she "didn't want him popping in and out of [Child's] life on holidays or only holidays or just say, here, I have something. I didn't want [Child] to grow up like that." *Id.* Mother indicated the only time Father provided gifts or any financial support for Child was when he brought a birthday gift and cupcakes to the park in July of 2019. *Id.* He never provided any other gifts or financial support to Child. *Id.*

Mother acknowledged that, approximately a week before she and Stepfather filed the petition to involuntarily terminate Father's parental rights, Father filed a petition for custody, as well as a petition for genetic testing. *Id.* at 37. Mother testified Child would not even know Father if she saw him. *Id.* Mother testified Stepfather provides the love, care, and support, financial or otherwise, for Child. *Id.* at 38.

On cross-examination, Mother admitted she blocked one of Father's phone numbers, but his current phone number was not blocked on her cell phone. *Id.* at 39. She testified she was unsure whether Father was still blocked on her Facebook account. *Id.* at 40. Mother admitted she never specifically provided Father with the address of her "new" house; however, she reiterated that she pointed to the house and informed Father she was moving there when they were at the park in July of 2019. *Id.*

Mother testified that, after Father was released from prison in April of 2019, she initially encouraged him and Child to have a relationship. *Id.* However, after she discovered that he was still selling drugs, she no longer encouraged a relationship between them. *Id.* Mother testified that, if Father had a court order, she would have allowed Child to visit with Father in a supervised visitation facility; otherwise, she was not inclined to do so unless he changed his lifestyle. *Id.* at 41. She testified she was not going to put Child "in harm's way in any way, shape, or form at any place, at any time before anybody." *Id.*

Mother testified that, prior to discovering he was still dealing drugs, she would have permitted Father to attend doctor's appointments, as well as have consistent contact with Child if he would have asked. *Id.* She noted that, after she discovered Father was still dealing drugs, she was not even comfortable with Father having supervised contact with Child because she didn't want Child or herself subject to that lifestyle. *Id.*

Upon questioning by the Orphans' Court, Mother confirmed that her feelings about Father's involvement with Child changed in 2019, approximately a month after the birthday party. *Id.* at 43. Mother indicated the first time she blocked Father's cell phone number was in September of 2019; however, Mother reiterated Father frequently "got a new number" and would "call [her] from that number." *Id.* at 44. She also indicated Father knows Stepfather's name and business. *Id.* The phone number associated therewith is publicly available on Facebook. *Id.* However, Father never reached out to Stepfather to see Child. *Id.*

On redirect examination, Mother confirmed that on August 31, 2020, she offered to allow Father to visit Child at the park. *Id.* at 45. She confirmed that she tried to arrange a visit at this time because she was not "totally against [Father] seeing [Child];" but rather, he "needed to get cleaned up in order to have [a] relationship with her." *Id.* at 46.

Father testified at the termination hearing via video from the Cambria County Jail. *Id.* at 49. He indicated he was "just a detainee right now. [He

hasn't] been proven guilty of anything." *Id.* at 50. Father testified Mother put "communication barriers" in place, which prevented him from seeing Child. *Id.* However, he admitted that, on the day Child was born, he entered prison and remained there until April of 2019. *Id.* He indicated that, after he was released from prison in 2019, Mother blocked his cell phone number in October of 2019. *Id.* He indicated she blocked his cell phone "during the period [he] was on an ankle bracelet from parole for having a few drinks." *Id.* He admitted that, in addition to wearing an ankle bracelet, he was not allowed to leave Allegheny County at that time. *Id.* at 51.

Father testified that, after he was released from prison in April of 2019, he worked at Allegheny Recycling for almost a year, and then "the pandemic hit." *Id.* He testified the last time he checked, before he was confined to the Cambria County Jail, he was still blocked on Mother's Facebook page. *Id.* He did not know Stepfather's last name. *Id.* He testified he learned of Stepfather's last name during "court proceedings, and [he] found out they were married." *Id.*

Father testified that, because Mother blocked him on Facebook, he didn't know how to get in contact with her. *Id.* at 52. He denied using a burner phone; but rather, he used an app, which generated a new phone number when he called Mother. *Id.* He indicated that she "hung up" when she heard his voice. *Id.* Father admitted that in August of 2020 Mother texted him. *Id.* at 53. However, he indicated she never gave him her new address, and he

denied that she pointed out the house when they were at the park in July of 2019. *Id.*

Father admitted Mother believed he was selling drugs after he was released from prison in April of 2019. *Id.* at 54. However, he indicated her belief was based on "hearsay," and he did not "go back" to selling drugs after his release from prison. *Id.* He initially denied that he ever threatened to take Child to Ohio; however, he then admitted that "after he built a strong relationship" with Child, he "would like to take her to Ohio." *Id.* at 55. He testified he always "wanted a biracial baby, and [Mother] was the person who gave [him] one." *Id.* Thus, he wanted a relationship with Child. *Id.*

Father testified that, in order to overcome barriers of communication, he "went through third parties." *Id.* He indicated he was "very close" with a "young lady," whose daughter worked with Mother. *Id.* at 56. Thus, in 2020, he asked this young lady's daughter to give Christmas gifts for Child to Mother. *Id.*

Father testified he filed a custody action because he was "tired of playing [Mother's] games about [himself]." *Id.* She tried to control who he saw and what he did. *Id.* He confirmed that he believed "all of these barriers and restrictions that were put in place by [Mother] made it impossible for [him] to have a relationship with [Child]." *Id.* at 57.

Father said he "would have done anything it took to have a relationship with [Child]." *Id.* As an example, he pointed to his eldest daughter, who was

- 15 -

"born when [Father] went to prison in 2005. [He] did five years and came home." *Id.* After he exited prison, he worked on having a relationship with his eldest daughter, and he would have done the same with Child. *Id.* Father admitted that, since he has been confined to the Cambria County Jail, he has not reached out to Mother; however, he has "dreamed about having a relationship with [Child]." *Id.* at 58.

On cross-examination, Father admitted that, after Mother blocked his original phone number in the fall of 2019, he contacted her using "an app or somebody else's phone." *Id.* at 59. This is how he "got around any block that she might have had on [his] previous number[.]" *Id.* He admitted Mother did not change her telephone number, and he "saved her number on [his] phone." *Id.* Father admitted that he was able to phone and text message Mother even after she blocked his number; however, this contact was "through other numbers, not through [his] personal number." *Id.* at 60.

Father admitted Mother encouraged him to meet Child twice during the summer of 2019, after he was released from prison. *Id.* at 61. He admitted he subsequently violated his parole, he had to wear an ankle bracelet, and he could not leave Allegheny County. *Id.* at 63. Father indicated Mother then became less willingly to facilitate visits with Child; however, he admitted that, on August 31, 2020, Mother offered to allow him to see Child at the park. *Id.* at 64. Father testified that, when he tried to make arrangements to meet,

Mother did not initially respond to his texts. *Id.* at 65. However, he admitted she responded a week later, but she was at the beach with Child. *Id.*

Father confirmed he was close friends with a woman, whose daughter worked with Mother. *Id.* at 67. He admitted his friend's daughter knew the address of Mother's new home. *Id.* He admitted that, after Mother moved to the new house, he did not conduct any search on the Internet or check county tax records to determine her new address. *Id.* at 69-70. Father indicated the only steps he took to determine Mother's new address was to ask people in bars who might have known Mother. *Id.* at 70.

On redirect examination, Father explained he sent Mother text messages on August 31, 2020, indicating that "no one is perfect," and wondering why she "shut [him] out from the start." *Id.* at 72. Mother responded the same day that, if Father wanted to see Child at the park, she would facilitate the meeting; however, she was taking Child to the beach on Friday morning. *Id.* at 73. Father replied, "I don't know when I'm leaving [for Ohio]. I'm waiting…on my parole to transfer." *Id.* Father explained to Mother that he could not make a firm plan at that moment to visit with Child because his other children in Ohio were homeless, and he had to ensure their well-being at that moment. *Id.* He told Mother he knew it was a process for him and Child to get to know each other, and he didn't care how long it takes. *Id.* at 74. Mother responded to Father that Child "needs someone who will be in her life every day, not someone who pops in and out." *Id.* Father

responded that it would be "a cold day in hell" before he lets Stepfather be Child's father. *Id.* at 75.

M.H. testified she is Father's fiancée. *Id.* at 77. She indicated she saw text messages between Father and Mother, and Mother then blocked Father's phone number. *Id.* She testified Father did not know Stepfather's full name, or Mother's married last name, until he filed court papers for custody. *Id.* She noted Father tried to find out where Mother lived so he could serve her "with the papers for court." *Id.* at 78. M.H. testified Father "knew where the physical house was, but because they had a heated discussion, the last exchange they had, he didn't think it was a good idea to go there." *Id.* at 78-79. She testified Father discovered the address of Mother's new home from his friend's daughter. *Id.* at 79.

On cross-examination, she clarified that Father knew the physical location of Mother's previous house, but he didn't think it was a good idea to go there to inquire about Mother's new address. *Id.* at 80.

On rebuttal/direct examination, Mother testified that, after Father violated his parole and was confined to Allegheny County, he never asked Mother to bring Child to visit him. *Id.* at 81.

At the conclusion of all testimony, by decree and opinion entered on May 2, 2024, the Orphans' Court granted the petition to involuntarily terminate Father's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1) and (b). Father's counsel filed a timely notice of appeal and a concise statement of

errors complained of on appeal. The Orphans' Court filed a brief Pa.R.A.P. 1925(a) opinion indicating it was adopting its May 2, 2024, opinion.

On appeal, Father sets forth the following issues in his "Statement of Questions Involved" (verbatim):

> A.    Did the trial court err in terminating the parental rights of Father, L.M., pursuant to 23 Pa.C.S.A. § 2511(a)(1) as the petitioners did not show by clear and convincing evidence that Father evidenced a settled purpose of relinquishing parental claim to the Child or he refused or failed to perform parental duties due to the barriers that were erected by Mother that prevented him from exercising his parental rights?
>
> B.    Did the trial court erred [*sic*] in terminating the parental rights of Father, L.M., pursuant to 23 Pa.C.S.A. § 2511(b) as the petitioners did not show by clear and convincing evidence that the termination was in the best interests of the Child?

Father's Brief at 2 (unnecessary capitalization and suggested answers omitted).

In examining Father's issues, we note the following relevant legal precepts: The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. The Orphans' Court must initially determine whether the conduct of the parent warrants termination under Subsection 2511(a).  Only if the court determines that the petitioners established grounds for termination under Subsection 2511(a) does it then engage in assessing the petition under Subsection 2511(b), which involves a child's needs and welfare.  *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013).  To involuntarily terminate parental rights, the

petitioners must prove grounds under both Subsections 2511(a) and (b) by clear and convincing evidence. *Id.*

Instantly, the Orphans' Court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b), which relevantly provide as follows:

> **(a) General rule.-**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***
>
> **(b) Other considerations.-**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b) (emphasis in original).

Regarding Subsection 2511(a)(1), our Supreme Court has held the following:

> [O]ur courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance, and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental

- 20 -

duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re Adoption of L.A.K.*, *supra*, 265 A.3d at 592 (internal citations and quotation marks omitted). Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* (citation omitted).

In assessing Subsection 2511(a)(1), the Orphans' Court should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *See In re Adoption of C.M.*, 667 Pa. 268, 255 A.3d 343 (2021). However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *In re Adoption of L.A.K.*, *supra*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977).

> [Thus], even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months…, the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].

*In re Adoption of L.A.K.*, *supra*, 265 A.3d at 593 (quotation marks and quotation omitted).

- 21 -

Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re B.,N.M.*, 856 A.2d 847, 855-56 (Pa.Super. 2004) (citations omitted).

Thus, a totality of the circumstances analysis includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Subsection 2511(b)." *Id.* As explained by our Supreme Court, "the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." *Id.*

Moreover, with respect to Subsection 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (PaSuper. 2018) (citation omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa.Super. 2008). "In addition to a bond examination, the court can equally emphasize the safety needs of the child under Subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs." *Id.* at 763. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33

A.3d 95, 103 (Pa.Super. 2011). Ultimately, the concern is the needs and welfare of the child. ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010).

In his first issue, Father, who has seen Child only two times in her life, admits he did not exercise his parental duties. ***See*** Father's Brief at 13. However, Father contends Mother and Stepfather erected barriers such that Father was unable to exercise his parental duties. ***Id.*** He avers he took reasonable steps to overcome these barriers such that Mother and Stepfather did not meet their burden of proof under Section 2511(a)(1). The record belies his claim.

Relevantly, the Orphans' Court indicated the following:

On March 6, 2024, after remand, upon agreement of the parties, the [Orphans' Court] held a hearing to address whether [Father] faced barriers, whether those barriers were reasonable, and whether [Father] took appropriate action to overcome those barriers. [Father] argues that Mother's action in blocking [Father's] number from her phone and her act in blocking him from her Facebook account were substantial barriers. Additionally, [Father] argues that his incarceration and/or parole were barriers. Mother [and Stepfather] argue that barriers are defined as "obstructive tactics where a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child." Mother [and Stepfather] argue that based on this definition, [their] conduct does not rise to the level that should be deemed a barrier.

The [Orphans' Court] finds that even if Mother's actions were considered "barriers," those actions were more than reasonable. Mother's knowledge and relationship with Father began in 2012. Specifically,…Mother testified that Father was a full-time drug dealer, she had personally observed him sell drugs, and [she] was not aware of any other job he had other than selling drugs….Mother testified that her [un]willingness or reluctance to allow Father's contact with Child was based on her desire to

- 24 -

protect her child.

\*\*\*

Interestingly, even though Mother had these concerns, initially, she provided [Father] an opportunity to have contact and a relationship with Child [when he was released from prison in 2019]. However, despite that willingness to permit his involvement, Mother eventually blocked [Father's] phone number from her phone and blocked him from her Facebook account. This was done because Mother described the calls and/or messages [as] harassing towards her and because she had been made aware that "he was [again] selling drug[s]." [N.T., 3/26/24, at 13-14.]

\*\*\*

Those messages, along with [Father's] admission as to how his relationship with Mother began, his incarceration, and his current incarceration, support and provide credibility to Mother's concerns and actions. Accordingly, to the extent Mother's actions are "barriers," [the Orphans' Court] finds any such barriers to be more than reasonable, and more in accordance with her fundamental obligations as a parent to protect her Child. Additionally, any such "barriers" could have been easily addressed by [Father]. In fact, [Father] had countless avenues available to exercise his parental duties. By way of example and not as a limitation, [Father] could have limited his communication with Mother to merely issues concerning Child. [Father] could have suggested or requested visits with Child. He could have sent letters or cards. He could have complied with terms of his parole or sought visits in Allegheny County. He could have sought treatment for what appears to be an underlying drug condition. He could…have provided minimal financial assistance for Child. Notwithstanding the many available and easily attainable options, [Father] has chosen to place blame on his failure to be a father and failure to exercise parental duties on everyone else.

As to any such barriers, the [Orphans' Court] finds that [Father] took no action with any degree of "reasonable firmness" to overcome those barriers. After first being released from jail [on April 2, 2019,] [Father] argues that he was restricted to Allegheny County and, as such, he could not visit Child. The [Orphans' Court] finds that this restriction appears to have been [put] in place because [Father] admitted [he] violated conditions of his parole[, and, thus, he had to wear an ankle bracelet]. [Mother, Stepfather, and Child lived in Indiana County.] [T]here is no credible evidence that [Father] tried to have contact [with

Child.] [H]e never asked for phone calls [with Child], never asked Mother to bring Child to Allegheny County, and never sent cards or letters. In the six (6) months preceding the filing of the [termination] petition, [on August 31, 2020,] Mother even offered [Father] another visit with Child. However, he never followed up on that offer. He has never contributed financially for Child. [Father] provided no testimony concerning any rehabilitative attempts to address whatever underlying problem, drug or otherwise, that caused his incarceration. In fact, [Father] is again incarcerated and has been incarcerated since the remand of this case. Mother never changed her phone number, never moved from the Clymer, PA, area, and never closed or cancelled her Facebook account. In fact, based on [Father's] own testimony, even though Mother blocked his [phone] number, he had ways to contact her via other phone numbers. When [Father] texted Mother from other phone numbers, she did not ignore the texts, and she would respond. However, it appears [Father] was more concerned with issues other than Child.

[The Orphans' Court's] finding that [Father] took no action with reasonable firmness to overcome any barriers is further supported by [Father's] actions, or better stated as "inaction," since the remand of this case from the Superior Court. The [Orphans' Court's] order of termination was vacated and remanded by Order of the Superior Court dated April 20, 2023. Due to difficulties in scheduling a hearing that would permit [Father's] participation, a hearing was not held until March 6, 2024. For almost a year, knowing that his conduct was under scrutiny, [Father] still did nothing to assert any parental duties and/or obligations. At the March 6, 2024, hearing, [Father] was questioned "[a]nd since you've been incarcerated in Cambria County, have you reached out to [Mother] or [Stepfather] to inquire about [Child]?" [Father] answered, "[n]o, I haven't because I don't know how to." [N.T., 3/6/24, at 3-8.] This response is perplexing [since the case] has been pending since October of 2020. The address of Mother and [Child] is part of the record. Clearly, there were attorneys involved for all parties who could have assisted with any contact. [Father] had a clear avenue and opportunity to initiate contact with Child, but [he] again failed to take any initiative to be a father.

In reviewing the six-month period preceding the filing of [the termination] petition, the [Orphans' Court] recognizes that [Father] filed a Child Custody Complaint approximately seven (7) days prior to the filing of the termination petition. This filing

requires the [Orphans' Court] to consider the significance and effect of custody related legal filings as a part of the analysis.

\*\*\*

[T]he mere filing of the [custody] complaint does not automatically end the analysis. The Court, while considering the "highly relevant" evidence, is still required to consider the totality of the circumstances. [Father] did not actively pursue the Custody Complaint. In fact, it appears that [Father] took little to no affirmative steps…[and] he provided no testimony that he participated in either an initial custody conference or mediation….When questioned about what affirmative steps he had taken, he responded, "[w]ell, I tried to contact [Mother]. Trying to wait it out, trying to wait it out…"

As stated above, [Father] failed to take any steps with reasonable firmness to overcome any barriers that were in place. [Father] has had little to no involvement in Child's life. He failed to utilize resources that may have been available while he was incarcerated to maintain any relationship with Child. [While he wrote Mother,] he never wrote to [Child], never sent any cards, never made any calls to speak with Child, and never requested to visit with Child. In fact, in Child's entire life, [Father] has only had contact with Child on two very limited occasions in 2019[, and both times, Mother facilitated the contact]. He has never provided any financial support and has never attempted to provide any other support for Child. [Father] testified that his relationship to Child is "non-existent." [The Orphans' Court] considered [Father's] excuses for his failure to parent Child, *i.e.*, his incarceration, subsequent parole, and what he claims [is] Mother's unwillingness to communicate and/or cooperate. However, the [Orphans' Court] does not find such excuses or his testimony relating to the same to be credible or persuasive.

Orphans' Court Opinion, filed 5/2/24, at 8-14 (citations omitted).

We find no abuse of discretion or error of law. The Orphans' Court considered the totality of the circumstances and properly concluded that Father refused or failed to perform his parental duties. **See** 23 Pa.C.S.A. § 2511(a)(1). While Father sought to place the blame entirely on Mother for his

failure to develop a relationship with Child, the record demonstrates Father's actions were not proactive for most of Child's life. *See In re B.,N.M.*, *supra* (holding focus in termination proceedings under Subsection 2511(a) is the conduct of the parent and whether his conduct justifies termination of parental rights). Moreover, Father's own actions, including his incarceration, subsequent violation of his parole, and wearing of an ankle bracelet, significantly prevented him from visiting Child, who lived in Indiana County. The sole two visits Father had with Child occurred because of Mother's facilitation thereof.

We note Father argued at length that his ability to visit Child was impeded because Mother and Child moved, and he did not know the new address. We reiterate that Mother testified that, during one of the July 2019 visits, she informed Father she was moving and pointed to the house to which she was moving, which was five blocks from her original house. The Orphans' Court found this testimony to be credible. In any event, Father admits that, after Mother moved, he never went to either the "old house" or Mother's "new house" in an effort to visit Child.

Next, we address the effect termination would have on Child pursuant to Subsection 2511(b), and whether termination would best serve the developmental, physical, and emotional needs and welfare of Child. The Orphans' Court relevantly indicated the following:

> All parties agree that Child does not know [Father] and would not recognize him. In [Child's] life, [Father] has only had

contact with Child on two occasions. The [Orphans' Court] finds that there is no bond between Child and [Father]. Stepfather has been the only father figure that Child has ever known. Stepfather has been involved in [Child's] life since shortly after her birth. He has provided financially for Child….[Also,] a father provides the intangibles that a child needs in life. Those intangibles include but are not limited to love, comfort, security, and stability. [Stepfather provides these intangibles for Child]. As such, the [Orphans' Court] finds by clear and convincing evidence that the termination of [Father's] parental rights and subsequent adoption by Stepfather furthers the developmental, physical, and emotional needs and welfare of Child and is in Child's best interests.

Orphans' Court Opinion, filed 5/2/24, at 14-15.

We find no abuse of discretion or error of law. We note Father suggests the Orphans' Court erred in failing to conduct a bond analysis. However, there is no dispute that Father has only seen Child, who was born in June of 2016, two times in her lifetime, and those two times were in July of 2019. There was no evidence of telephone calls or zoom "visits" between Father and Child. Mother indicated that, if Child saw Father, she would not even know him. Accordingly, since there is no evidence of any bond between Child and Father, it was reasonable for the Orphan's Court to infer no bond exists. **See In re K.Z.S.**, **supra**. Furthermore, the Orphans' Court properly highlighted the intangibles, such as love, comfort, and security, and stability, Child has with Stepfather. **See In re N.A.M.**, **supra**.

For all of the foregoing reasons, we affirm the Orphans' Court's decree involuntarily terminating Father's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/15/2024